*1198 ATTORNEY DISCIPLINARY PROCEEDINGS
| .PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Neil P. Levith, an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS
The underlying facts of this matter are not in dispute, having been stipulated to by the parties. These stipulations may be summarized as follows:
Respondent’s law practice is primarily confined to handling residential real estate transactions. When he handled a closing involving a sale or refinancing,[1] respondent deposited the funds he received into his trust account, then disbursed the funds to the appropriate parties. Typically, respondent did not immediately withdraw his attorney’s fees from the trust account, in an attempt to ensure that sufficient funds were in the account to cover any checks from third parties which were subsequently dishonored.
In April 2000, respondent’s title insurance underwriter, First American Title Insurance Company (“First American”), conducted a routine audit of respondent’s trust account and discovered drafts and checks drawn on the trust account payable to casinos, in violation of the Insurance Code. First American immediately terminated| ¡.respondent's Agency Agreement and reported its findings to the Louisiana Department of Insurance (“Department”), which conducted its own audit. The examiners found that in 1999 and 2000, twenty-two drafts and checks totaling $20,500 were drawn on respondent’s trust account payable to casinos in Las Vegas, New Orleans, and Biloxi.
By order of the Department dated April 18, 2000, respondent’s insurance license was summarily suspended and he was ordered to cease and desist from the solicitation or sale of any insurance coverage in the State of Louisiana. At the conclusion of the Department’s examination, respondent agreed to pay a $5,000 fine, and he agreed that any further violations of the Insurance Code will be cause for the revocation of his insurance license. Thereafter, the Department rescinded its summary suspension and cease and desist order effective June 22, 2000.
The Department forwarded the documents relating to its examination to the ODC, which in turn requested an audit of respondent’s trust account by its audit consultant, Ronald White. Mr. White determined that respondent left his own funds *1199 in the trust account with funds belonging to others, and he determined that the casino transactions resulted in eight instances of conversion of client and third-party funds in the amount of $5,571.67. Respondent and the ODC have stipulated that this conversion would not have occurred but for the posting of some drafts to the trust account by Paris Las Vegas Casino and Harrah’s New Orleans Casino.[2] The parties further stipulated that all shortfalls have been repaid and that no third parties were actually harmed as a result of respondent’s actions. Finally, the parties stipulated that respondent has taken remedial steps to prevent a recurrence of this type of activity in |3the future, including the establishment of a new trust account and the implementation of an accounting program that allows only computer-generated checks requiring two signatures. This program also results in zero balancing of each transaction, and a three-way reconciliation of the trust account. Since the program was implemented, respondent has had no exceptions on the audits of his trust account by his title insurance underwriter.
DISCIPLINARY PROCEEDINGS
Following its investigation, the ODC filed one count of formal charges against respondent, alleging that his conduct violated Rules 1.15(a)(b)(c) (safekeeping property of clients or third persons) and 8.4(a) (violation of the Rules of Professional Conduct) of the Rules of Professional Conduct. Respondent answered the formal charges and admitted the factual allegations therein, but denied any intentional misconduct. Specifically, respondent denied that he intentionally commingled client funds with his own funds or intentionally converted client funds; rather, respondent suggested that nothing “other than a technical, and unintentional conversion of fiduciary funds occurred as a result of the actions complained of.”

Formal Hearing

This matter proceeded to a formal hearing before the hearing committee. The parties submitted joint stipulations of fact and agreed to the introduction of various exhibits. Respondent testified on his own behalf, explaining that with respect to his accounting procedures, he generally left several thousand dollars of earned fees in his trust account in order to protect his clients and third parties. Respondent cleared the account of his fees every 30 to 45 days, when he wrote a check to the title insurance 14company for its fees. Respondent did not regard this practice as improper because his intent was to make sure there was always enough money in the account. Nevertheless, after the problems surfaced with the trust account, respondent now zero balances the account and issues himself a check for his fees in each transaction, which he then deposits into his operating account.
Turning to the issue of his gambling habits, respondent testified that he and his wife have enjoyed going to casinos since the 1980’s. Respondent initially established a line of credit at the Desert Inn Casino in Las Vegas, which would permit him to gamble and then send him a bill to be paid within thirty days. When respondent received the bill from the casino, he testified that he “picked up the checkbook with the most fees in it, and I paid it out of that checkbook.” Respondent emphasized *1200 that the casino bills were never paid from funds belonging to his clients or third parties, although he acknowledged that he should have taken his fees out of the trust account and put them into his operating account, then paid the casino bills from that account.
In 1999, respondent’s host at the Desert Inn Casino, Ana Basa, moved to the Paris Casino. At Ms. Basa’s invitation, respondent went to the Paris Casino in late October 1999 and opened a $10,000 credit line. On November 1, 1999, Ms. Basa passed respondent’s markers directly into his trust account. Respondent testified that he was surprised to learn of this transaction, because he was accustomed to receiving a bill from the casino. However, he explained that instead of sending a bill, the Paris Casino “just took the markers and used them as checks, directly depositing them.” Respondent telephoned Ms. Basa and told her “that can’t be done.” Ms. Basa apologized for the mistake and assured respondent it would not happen again. Nevertheless, when respondent and his wife spent New Year’s Eve 2000 at the Paris Casino, Ms. Basa also sent those markers through the trust account. Respondent | ¡^stated that because he had previously paid the Desert Inn with a trust account check, he assumed Ms. Basa had transferred the account number to the Paris Casino when she moved there. Respondent later learned that Harrah’s New Orleans Casino (“Harrah’s”) had access to the account number as well, and that Har-rah’s also passed his markers through the account instead of sending a bill. According to respondent, he has since canceled all of his casino credit lines and has not gambled since January 2003.
Michal Marcyn, a representative of Har-rah’s, testified that a casino in Las Vegas supplied Harrah’s with respondent’s trust account number. When respondent did not pay his markers before departing Har-rah’s, the casino processed the markers by drafting the trust account. Mr. Marcyn also confirmed that respondent’s account with Harrah’s is inactive.
Michael Brubaker, a nationally certified gambling counselor, testified that respondent was referred to him in January 2003 by Bill Leary of the Lawyers Assistance Program. Following an assessment, Mr. Brubaker concluded respondent is either a problem gambler or a social gambler, but that he is not a compulsive or pathological gambler. Respondent was initially reluctant to seek treatment for his gambling problem, but he has committed to stop gambling and has agreed to participate in a one-year treatment program. Mr. Bru-baker testified that respondent will likely be successful in overcoming his gambling problem if he completes the treatment program; however, Mr. Brubaker recommended that as a “support system,” respondent should be “mandated to continue with recovery with me, ... [or] be connected with the Lawyer’s Assistance Program” for a period of two to five years.
Kathy Sutton is a Louisiana-licensed attorney who works as an auditor for Commonwealth Land Title Insurance Company (“Commonwealth”), respondent’s | (¡current underwriter. Ms. Sutton is responsible for performing quality assurance audits, including escrow accounting reviews, on Commonwealth’s title insurance agents in Louisiana, Mississippi, and Alabama. Ms. Sutton has uncovered no “red flags” in the four such audits she has performed on respondent since he began issuing title insurance policies for Commonwealth in mid-2000.

Hearing Committee Recommendation

At the conclusion of the hearing, the hearing committee filed its report with the disciplinary board. The committee determined that respondent testified in a sin *1201 cere and truthful manner. Although it recognized respondent’s trust accounting practices were improper, it did not believe he intended to convert client funds.
In determining a sanction, the committee concluded that a fully-deferred suspension was appropriate under these facts, noting that an actual suspension would impair respondent’s ability to make a living. Accordingly, the committee recommended that respondent be suspended from the practice of law for one year and one day, fully deferred, subject to a five-year period of supervised probation with specified conditions.[3]
The ODC filed an objection to the hearing committee’s report and recommendation.

Disciplinary Board Recommendation

Following its review of the record, the disciplinary board found that the stipulated facts are not manifestly erroneous. The board also made additional factual 17findings relating to respondent’s trust account and the manner in which it was handled. Based on the stipulated facts, as supplemented, the board determined respondent violated Rules 1.15(a), 1.15(c), and 8.4(a) of the Rules of Professional Conduct. The board found respondent did not violate Rule 1.15(b).
In addressing sanctions, the board observed that respondent knowingly violated duties owed to his clients and to a third party, First American Title Insurance Company. Although the board found respondent had no intent to cause harm, it noted he knowingly put his trust account in jeopardy by paying his gaming debts out of the account and by permitting casinos access to the account. Under these circumstances, the board determined the potential for harm was significant. Citing Standard 4.12 of the ABA’s Standards for Imposing Lawyer Sanctions,[4] the board concluded the baseline sanction for such misconduct is a suspension from the practice of law.
As aggravating factors, the board found a pattern of misconduct (eight months of gambling withdrawals from the trust account) and substantial experience in the practice of law (admitted 1975). In mitigation, the board acknowledged the absence of a prior disciplinary record, a cooperative attitude toward the disciplinary proceedings, and the imposition of other penalties or sanctions, in the form of a six-week suspension of respondent’s insurance license and a $5,000 fine imposed by the Department of Insurance.
Considering these factors, the board recommended that respondent be suspended from the practice of law for one year and one day, with six months | ^deferred, followed by a five-year period of probation subject to the conditions recommended by the hearing committee.[5]
Both respondent and the ODC filed objections to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
*1202 DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass’n v. Boutall, 597 So.2d 444 (La.1992).
As previously noted, the parties have largely stipulated to the facts of this case. Based on our review of the record, we find these stipulations are not clearly wrong. Accordingly, we conclude that respondent violated Rules 1.15(a), 1.15(c), and 8.4(a) of the Rules of Professional Conduct when he commingled his own funds with client and third-party funds held in his trust account and converted client and third-party funds on eight occasions, totaling $5,571.67.
Having found professional misconduct, we now turn to a discussion of an appropriate sanction. In considering that issue, we are mindful that the purpose of disciplinary proceedings is not primarily to punish the lawyer, but rather to maintain the appropriate standards of professional conduct, to preserve the integrity of the legal profession, and to deter other lawyers from engaging in violations of the standards of 19the profession. In re: Vaughan, 00-1892 (La.10/27/00), 772 So.2d 87; In re: Lain, 00-0148 (La.5/26/00), 760 So.2d 1152; Louisiana State Bar Ass’n v. Levy, 400 So.2d 1355 (La.1981). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. In re: Redd, 95-1472 (La.9/15/95), 660 So.2d 839; Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
A review of this court’s jurisprudence reveals that we have consistently treated conversion of client funds as one of the most serious professional transgressions a lawyer can commit. We have routinely imposed disbarment or even permanent disbarment in cases of egregious conversion. Of course, we recognize that not all instances of conversion warrant such severe sanctions. In Louisiana State Bar Ass’n v. Hinrichs, 486 So.2d 116 (La.1986), we explained that the determination of an appropriate sanction in conversion cases often turns on several factors, including the lawyer’s state of mind. Typically, we have imposed the most severe sanctions in cases where the lawyer acts in bad faith and intends a result inconsistent with his or her clients’ interests. By contrast, we have imposed more lenient sanctions in cases in which the lawyer’s conversion results from negligence, without any intent to cause harm to his or her clients.
In the instant ease, we are convinced that respondent’s conversion was a product of negligence. Respondent’s testimony, which the hearing committee found to be credible, reveals that he never intended to place his clients’ funds at risk. Instead, the conversion resulted from an unusual chain of events in which a casino debited his trust account directly, rather than sending him a bill as it had done in the past.
I min making this finding, we in no way absolve respondent of responsibility for his acts. Respondent’s initial payment of his gambling debts from his trust account gave the casinos access to his trust account number and set in motion the course of events which ultimately led to the conversion. Unquestionably, respondent should never have used his trust account to pay *1203 personal debts (even though he was using his personal funds and not client funds) and should have taken measures to prevent the casinos from having access to this account after he first learned there was a problem. Respondent’s conduct falls far below the high standard of care this court requires of attorneys who have control over funds belonging to others and created a great potential for client harm.
However, in the final analysis, we must conclude respondent’s actions were negligent rather than intentional. Thus, the baseline sanction for this misconduct is a suspension from the practice of law in the range of twelve to eighteen months.
Numerous mitigating factors are present, including respondent’s lack of any pri- or disciplinary record during his nearly thirty years of practice, his cooperative attitude during these proceedings, and the imposition of other penalties and sanctions. We further recognize that respondent, on his own initiative, has taken steps to completely stop gambling and by all accounts has been successful in doing so.
Considering all the unique facts of this case, we conclude the appropriate sanction for respondent’s misconduct is a suspension from the practice of law for a period of one year and one day. In light of the significant mitigating factors, we will defer all but thirty days of this suspension and place respondent on supervised probation for a period of one year, during which respondent’s trust account shall be audited on quarterly basis and he shall continue counseling with Mr. Brubaker or a similar counselor approved by the Lawyers Assistance Program. Any violation of |nthese conditions or other misconduct during the probationary period may be grounds for making the deferred portion of the suspension executory or imposing additional discipline, as appropriate.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Neil P. Levith, Louisiana Bar Roll number 8681, be suspended from the practice of law in Louisiana for a period of one year and one day. It is further ordered that all but thirty days of this suspension shall be deferred and respondent shall be placed on supervised probation for a period of one year, subject to the following conditions: (1) at respondent’s expense, his trust account shall be audited on a quarterly basis during the period of probation by a qualified independent auditor; and (2) he shall continue counseling with Michael Brubaker or a similar counselor approved by the Lawyers Assistance Program. Any violation of these conditions or other misconduct during the probationary period may be grounds for making the deferred portion of the suspension execu-tory, or imposing additional discipline, as appropriate. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
JOHNSON, J., would suspend for six months.
VICTORY, J., dissents and would follow the Board’s recommendation.

. From June 1, 1999 through February 29, 2000, respondent handled approximately 270 real estate closings through his trust account.

. It was respondent’s intention that some drafts would be posted to his operating account, rather than his trust account; however, respondent had provided one of the casinos with the account number for his trust account, which was then passed along to other casinos via a shared data bank. Letters of apology from Paris Las Vegas Casino and Harrah’s New Orleans Casino were introduced into evidence at the formal hearing.

. Both, the hearing committee and the disciplinary board recommended that respondent be placed on probation for a period of five years. However, Supreme Court Rule XIX, § 10(A)(3) limits a probationary period to two years.

. Standard 4.12 provides suspension is appropriate “when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.”

.One board member dissented and would adopt the hearing committee's recommendation of a fully deferred suspension; another board member dissented and would recommend a three-year suspension.